# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| SE-KURE CONTROLS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | No. 02 CV 3767 |
| | ) | |
| v. | ) | Wayne R. Andersen |
| | ) | District Judge |
| VANGUARD PRODUCTS GROUP, INC., et al, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the court on the assertion made by the remaining defendants, Vanguard Products Group, Inc. ("Vanguard") and Telefonix, Inc. ("Telefonix", collectively, "Defendants"), that plaintiff Se-Kure Controls, Inc. ("Plaintiff" or "Se-Kure") engaged in inequitable conduct in the prosecution of U.S. Patent 5,552,771 ("the '771 Patent") and U.S. Patent RE 37,590 ("the '590 Patent"). For the reasons set forth below, Defendants failed to persuade this court that Plaintiff engaged in inequitable conduct. Judgment is entered for Plaintiff on Defendants' counterclaim of inequitable conduct.

## BACKGROUND

**I.      Procedural Background**

This case involves a patent for an anti-theft device. Se-Kure filed this lawsuit alleging that Defendants willfully infringed the '590 Patent, by manufacturing, having made, using, selling or offering for sale retail merchandise security systems employing retractable sensors, and/or by selling components of those systems. Defendants' Second Amended Counterclaim alleged non-infringement, invalidity, inequitable conduct, and an antitrust violation.

Se-Kure asserted the '590 Patent against other defendants in other cases in the Northern District of Illinois, namely Civil Action No. 06 C 4857 entitled *Se-Kure Controls, Inc. v. Diam USA, Inc., et al.* (the "*Diam* case") and Civil Action No. 08 C 6075 entitled *Se-Kure Controls, Inc. v. Sennco Solutions Inc., et al.* (the "*Sennco* case"). Telefonix is a defendant in both this case and the *Diam* case.

On January 29, 2007, Defendants filed a motion for summary judgment on the issue of inequitable conduct, arguing that the inventors of the '590 Patent (1) knowingly failed to disclose the most material prior art to the United States Patent and Trademark Office ("PTO") during the patent application process, and (2) subsequently filed knowingly false declarations concerning the prior art. (Dkt. No. 284). On September 27, 2007, this court denied the motion for summary judgment, concluding that material facts were disputed, including: "(1) whether Se-Kure's agents knew or should have known that certain prior art discovered by Se-Kure during the patent application process was material to that pending patent application; and (2) whether Se-Kure and its agents had the intent to mislead the USPTO during the patent application process." (Dkt. No. 372).

On September 18, 2009, Judge Guzman entered a Memorandum Opinion and Order in the *Diam* case, holding the '590 Patent invalid as obvious in view of certain prior art. Se-Kure appealed Judge Guzman's decision in the *Diam* case to the United States Court of Appeals for the Federal Circuit. In light of the pending appeal, this court granted a stay for all proceedings in this case, with the exception of Defendants' counterclaim of inequitable conduct. (Dkt. No. 438).

An inequitable conduct hearing was held on April 28, 2010, and continued to May 10, 2010. Between these hearings, the Federal Circuit heard oral arguments in the *Diam* case, and

on May 5, 2010, that court entered an order affirming Judge Guzman's decision, holding the '590 Patent invalid as obvious in view of certain prior art. Nevertheless, this court resumed the hearing on inequitable conduct, as the issues of patent validity and inequitable conduct are distinct issues requiring separate analyses. *See Afga Corp. v. Creo Products Inc., et al.*, 451 F.3d 1366, 1372 (Fed. Cir. 2006); *Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1213 (Fed. Cir. 1987).

## II.     Factual Background

Based on the documents submitted by the parties and the testimony provided at the inequitable conduct hearing, we summarize the relevant facts as follows. Inventors Roger J. Leyden ("Leyden") and Terrance Surma ("Surma"), both employed by Se-Kure, filed a patent application June 10, 1994, which subsequently issued as the '771 Patent on September 3, 1996. ('771 Patent, Defs.' Ex. 13). In May 1996, while the '771 Patent application was still pending, one of Se-Kure's customers contacted Se-Kure expressing interest in a recoiler produced by Telefonix. (Defs.' Ex. 7). On May 13, 1996, Peter Passuntino, Vice President of Operations of Se-Kure, contacted Paul Burke ("Burke"), president of Telefonix, and discussed the customer's interest in the Telefonix recoiler. (*Id.*) Also on May 13, 1996, Surma conducted a patent search of any existing patents held by Burke. (Defs.' Ex. 28). Two of the patents revealed in that search were U.S. Patent 4,989,805 ("the '805 Patent") and U.S. Patent 5,094,396 ("the '396 Patent"), both of which were described as "Retractable Reel Assembly For Telephone Extension Cord," and both of which had abstracts explicitly stating that the devices were to be used "in proximity to a telephone or telephone jack for utilization with either wall mounted or table telephones." (Defs.' Ex. 28). Neither Leyden nor Surma revealed these patents to the PTO in connection with the pending application for the '771 Patent.

On February 19, 1997, Se-Kure filed a reissue application of the '771 Patent, which issued as the '590 Patent on March 19, 2002. (Defs.' Ex. 17). In the reissue declaration, Leyden and Surma stated, "[W]e believe that the '771 patent is partly inoperative or invalid by reason of claiming both more than we had a right to claim in the patent and less than we had a right to claim in the patent." (Defs.' Ex. 19, ¶ 8). The reissue declaration then revealed the existence of "prior art," including the '805 and '396 Patents, and U.S. Patent 5,535,960 ("the '960 Patent"). (*Id*. at ¶ 9b). In explaining the inventors' failure to disclose the prior art in connection with the original application for the '771 Patent, Leyden and Surma stated,

> Upon information and belief, this error arose due to a failure of the undersigned to appreciate and communicate certain prior art to the assignee's prosecuting attorney. Specifically, the undersigned were at the time of their invention aware of cable retraction devices used in connection with telephones. Such devices were different from the undersigned's invention because they did not in any way relate to security systems or alarms and had no sensor for detecting whether a product is connected to the cable.

(*Id*. at ¶ 11a). The inventors indicated that they discovered the '960 Patent after investigating a possible infringement of the '771 Patent, at which point they brought the matter to the attention of their attorney, who subsequently obtained copies of the '805 and '396 Patents. (*Id*. at ¶ 11b).

## LEGAL STANDARD

"To successfully prove inequitable conduct, the accused infringer must present evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to receive the [PTO]." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008) (internal citations omitted).

> [O]ne who alleges a 'failure to disclose' form of inequitable conduct must offer clear and convincing proof of: (1) prior art or information that is material; (2) knowledge chargeable to applicant of that prior art or information and of its materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO.

4

*FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987).

"Clear and convincing evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is highly probable." *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (internal citations omitted).

## DISCUSSION

Defendants argue that Se-Kure engaged in inequitable conduct in two ways. First, they claim that Leyden and Surma had a duty to disclose the existence of the '805 and '396 Patents before the '771 Patent issued, which they failed to do. Second, Defendants argue that Leyden and Surma filed knowingly false declarations with the PTO in connection with the reissue application for the '590 Patent. We first address the latter argument, then the former.

**I.     Reissue Declaration for the '590 Patent**

Defendants assert that the reissue declaration was false insofar as it suggested that the inventors' attorney, not Leyden and Surma themselves, discovered the '805 and '396 Patents. We disagree. It is true that the declaration states that the attorney "obtained copies" of the '805 and '396 Patents. (Defs.' Ex. 19 at ¶ 11b). However, earlier in the declaration, Leyden and Surma admit that they themselves had discovered certain prior art, but that they failed to "appreciate and communicate" certain prior art to their attorney because they believed that prior art was completely unrelated to the '771 Patent. (*Id.* at ¶ 11a).

The reissue declaration does not withhold the fact that Leyden and Surma discovered certain prior art prior to the issuance of the '771 Patent, and the inventors' statement that their attorney "obtained copies" of the '805 and '396 Patents does not preclude the possibility that the inventors themselves *also* discovered those patents at an earlier date. Therefore, we determine

5

that Leyden and Surma did not submit a false declaration with the PTO in connection with the reissue application for the '590 Patent.

## II. Failure to Disclose Prior Art in Connection with the Application for the '771 Patent

According to Defendants, once Leyden and Surma became aware of the existence of the '805 and '396 Patents, they had an obligation to disclose those patents to the PTO in connection with the application for the '771 Patent. As stated above, in order to prove inequitable conduct, Defendants must establish, by clear and convincing evidence, (1) that the prior art was material, (2) that the applicant knew of the prior art and its materiality, and (3) that the applicant failed to disclose the prior art with the intent to mislead the PTO. *FMC Corp.*, 835 F.2d at 1415. We address each of these elements in turn.

### A. Materiality of Prior Art

"[I]nformation is material when a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Star Scientific, Inc.*, 537 F.3d at 1367 (quoting *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1297 (Fed. Cir. 2008)).

As mentioned earlier, Judge Guzman determined, and the Federal Circuit affirmed, that the '590 Patent was invalid as obvious, specifically in light of the '805 Patent and U.S. Patent 5,172,098 ("the '098 Patent"). The category of "material prior art" contemplates a broad range of information which would include within it "invalidating prior art." *See, e.g., AGFA Corp. v. Creo Prods., Inc.*, 451 F.3d 1366, 1373 (Fed. Cir. 2006) ("material prior art need not even be invalidating prior art") (internal citations omitted). Since the '805 Patent is so relevant to the '590 Patent that it led to the invalidation of the '590 Patent, this court concludes that the '805

Patent was "material" to the '590 and '771 Patents. Furthermore, given the similarities between the abstracts of the '805 Patent and the '396 Patent, the '396 Patent was also "material."

### B. Applicants' Knowledge of Prior Art and Materiality

Defendants must prove that Leyden and/or Surma knew of the prior art, the '805 and '396 Patents, and knew that those patents were material to the '771 Patent.

> [An] [a]pplicant must be chargeable with knowledge of the existence of the prior art or information, for it is impossible to disclose the unknown. Similarly, an applicant must be chargeable with knowledge of the materiality of the art or information; yet an applicant who knew of the art or information cannot intentionally avoid learning of its materiality through gross negligence, i.e., it may be found that the applicant "should have known" of that materiality.

FMC Corp., 835 F.2d at 1415.

There is no question that the inventors had knowledge of the '805 and '396 Patents while the application for the '771 Patent was still pending. The inventors became aware of the existence of the '805 and '396 Patents after conducting a search for Burke patents on May 13, 1996, and the '771 Patent did not issue until September 3, 1996. (*See* Defs.' Ex. 13, 28). The point over which the parties disagree is whether Leyden and/or Surma were aware of the *materiality* of the '805 and '396 Patents.

Defendants argue that Leyden and/or Surma must have been aware that Telefonix had products material to the device described in the '771 Patent, because Se-Kure specifically contacted Burke at Telefonix seeking to use the Telefonix products to fulfill a request made by Se-Kure's customer. (Defs.' Ex. 27).

Leyden acknowledged that he was aware of the Telefonix recoilers, but emphasized that the May 1996 search for Burke patents revealed no products used in connection with security or alarm systems. As mentioned above, Leyden and Surma stated in their reissue declaration that

7

they failed to "appreciate and communicate certain prior art to [their] prosecuting attorney" because the devices were unrelated to security systems or alarms. (Defs.' Ex. 19 at ¶ 11a).

John Mortimer ("Mortimer"), Leyden and Surma's patent attorney, testified at the inequitable conduct hearing regarding the materiality of the '805 and '396 Patents. Mortimer (and other attorneys present at the hearing) made reference to the 2007 Supreme Court case of *KSR International Co. v. Teleflex Inc., et al*, 550 U.S. 398 (2007). According to Mortimer, *KSR* changed the law regarding analogous versus non-analogous art, broadening the category of what would be considered material prior art. (Tr. 5/10/10, p. 296, ln. 18 - p. 297, ln. 22). As he pointed out, by the time the '771 Patent application was filed, retractable devices were everywhere, including certain telephone mechanisms. (Tr. 5/10/10, p. 287, lns. 2-7). Mortimer concluded that there would not have been a need to reference retractable devices used in different product areas or "fields of art" that were unrelated to security systems or alarms. (Tr. 5/10/10, p. 294, ln. 15 - p. 295, ln. 21).

Mortimer testified that the examiner for the '771 Patent application "made it clear he was not looking at nonanalogous art if it was not related to alarm systems." (Tr. 5/10/10, p. 301, lns. 5-7). The PTO also made a statement during the reissue application process for the '590 Patent in which it recognized various uses for retraction devices, but noted that such systems, including telephone systems, have "substantially different requirements than an alarm system." (Defs.' Ex. 18, tab 25, p. 3). The PTO ultimately decided to re-issue Plaintiff's patent, even after the '805 and '396 Patents were disclosed to it.

Leyden and Surma explained in their reissue declaration that they did not consider patents involving retraction devices for telephone systems to be material. Mortimer, their prosecuting attorney, came to the same conclusion, and stressed that this conclusion would be

particularly true in the time preceding the *KSR* decision.  Based on the evidence presented, this court cannot conclude that Leyden and/or Surma "should have known" that the '805 and '396 Patents were material to the application for the '771 Patent.

### C. Applicants' Intent

"[C]lear and convincing evidence must prove that an applicant had the *specific intent* to . . . mislead [ ] or deceiv[e] the PTO.  In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant *made a deliberate decision* to withhold a *known* material reference." *Star Scientific, Inc.*, 537 F.3d at 1366 (quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995) (emphasis in original).  "[B]ecause direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence." *Star Scientific, Inc.*, 537 F.3d at 1366 (citing *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007)).  However, "the inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard." *Star Scientific, Inc.*, 537 F.3d at 1366 (citing *Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 528 F.3d 1365, 1376 (Fed. Cir. 2008)).

This court concludes that Defendants have not met their burden of establishing deceptive intent by clear and convincing evidence.  Leyden testified that he had no intent to deceive the PTO, thoroughly explaining the thoughts and motives he had at various times through the original application process and the subsequent reissue application process, and the court found his testimony to be credible.  The court also reviewed the video deposition of Surma, and found nothing in his testimony that would lead to the conclusion that he had a specific intent to deceive.

Furthermore, the inventors voluntarily revealed the '805 and '396 Patents to the PTO in connection with the reissue application for the '590 Patent, just a few months after the issuance of the '771 Patent. Such forthcoming conduct would not be expected from individuals possessing an intent to deceive the PTO. Moreover, Mortimer testified that neither Leyden nor Surma expressed any reservation to filing the reissue application, even though the '771 Patent would not have been enforceable during that time, and the reissue process could be lengthy (approximately five years, in this case). (Tr. 5/10/10, p. 276, lns. 3-10).

As mentioned earlier, the examiner for the '771 Patent application expressed little interest in studying products unrelated to security or alarm systems. After the '805 and '396 Patents were revealed to the PTO, the PTO still decided to issue the '590 Patent. This supports the notion that Leyden and Surma were reasonable in their belief that the PTO would not have considered the '805 and '396 Patents relevant to the '771 Patent application, and did not intend to deceive the PTO by not disclosing those patents in the original application.

Defendants argued that the sequence of events that occurred in May 1996 should lead to the inference that Leyden clearly intended to deceive the PTO. As mentioned earlier, Se-Kure became aware of the '805 and '396 Patents on May 13, 1996, after conducting a patent search of existing patents held by Burke. (Defs.' Ex. 28). The parties agree that Se-Kure then began to redesign its recoiler on May 15, 1996. (Pl.'s Suppl. Mem. Objecting to Defs.' Ex., Dkt. No. 451, at 2; Defs.' Resp. to Pl.'s Objection to Defs.' Demonstrative Ex., Dkt. No. 453, at 6). According to Defendants, "[t]he transformation of [Leyden's] single, flat cable design into a dual flat and round cable design happened as soon as he read the Burke Patents which in detail describe a flat cord/round cord combination," implying that Leyden knew of the materiality of those patents, and intentionally withheld them from the PTO. (Defs.' Resp. to Pl.'s Objection to Defs.'

10

Demonstrative Ex., Dkt. No. 453, at 6). Defendants presented a demonstrative exhibit during closing arguments which showed the similarities between Burke's design and Se-Kure's final redesigned product. However, as Plaintiff explained to the court, the image of Se-Kure's "redesigned" product presented to the court was based on a physical exhibit manufactured years *after* 1996, not on the redesign images in Se-Kure's possession as of May 1996. (Pl.'s Suppl. Mem. Objecting to Defs.' Ex., Dkt. No. 451, at 2; Defs.' Resp. to Pl.'s Objection to Defs.' Demonstrative Ex., Dkt. No. 453, at 1 n. 1). Se-Kure asserts that it "only ***began*** its redesign in May of 1996," that it initially went in an entirely different design direction, and that "[t]he redesigned product did not even ***begin*** to resemble the drawing in Defendants' demonstrative until December 1996 – long *after* the issuance of the '771 patent." (Pl.'s Suppl. Mem. Objecting to Defs.' Ex., Dkt. No. 451, at 2 (emphasis in original)). Se-Kure cites Mr. Parent's Computer-Aided Design files in support of this description of the evolution of the Se-Kure product. (*Id*. at 2-5).

Defendants have not clearly and convincingly persuaded the court that the applicants had any deceptive intent.

## CONCLUSION

For the foregoing reasons, this court finds that Defendants have not shown by clear and convincing evidence that Se-Kure, through its agents Leyden and Surma, engaged in inequitable conduct in the prosecution of the '771 and '590 Patents. Judgment is entered for Plaintiff on the counterclaim of inequitable conduct.

It is so ordered.

_____
Wayne R. Andersen
United States District Judge

Dated: June 4, 2010